# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CASE NO. 5:10-CV-00040-R

JSC TERMINAL, LLC                                                    PLAINTIFF

v.

PAUL F. FARRIS                                                       DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter comes before the Court upon Defendant's Motion for Summary Judgment (DN 23). Plaintiff has responded (DN 31) and Defendant has replied (DN 35). This matter is now ripe for adjudication. For the reasons that follow, Defendant's Motion is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

Plaintiff JSC Terminal, LLC ("JSC") alleges that Defendant Paul F. Farris, its former employee, is in violation of a Non-Competition and Confidentiality Agreement ("Agreement"). Farris argues that JSC does not have standing to bring a breach of contract claim against him based on the Agreement because the Agreement was never assigned to JSC.

On or about September 19, 2007, Farris was hired by MidWest Terminal, Inc. ("MidWest") as a salesperson. At that time, Farris executed the Agreement as a condition of his employment with MidWest. He agreed to a non-compete clause that restricted his actions for three years after his employment with "the Company," defined as MidWest and its subsidiaries or affiliates.

On February 18, 2009, MidWest entered into an Asset Purchase Agreement ("APA") with JSC. The APA provided for the transfer of assets from MidWest to JSC. The APA also included a clause limiting JSC's assumption of liabilities and a clause barring MidWest's

employee agreements from being binding on JSC.  Pursuant to the APA, on February 18, 2009, Farris was terminated by MidWest.  Farris was then hired by JSC.

On January 11, 2010, JSC terminated Farris.  Since that time, Farris has accepted employment with Seay Oil Company, Inc. ("Seay") in Hopkinsville, Kentucky.  JSC claims that Farris is soliciting its business for Seay in violation of the Agreement.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Monette v. Elec. Data Sys.*

*Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## ANALYSIS

The parties agree that the primary issue presented to the Court by Farris's Motion is whether JSC was assigned the rights under the Agreement. First, however, the Court must determine whether this issue implicates JSC's standing or its status as a real party in interest.

### A. Whether JSC Was Assigned Rights Under The Agreement Is A Question Of Real Party In Interest.

As the Sixth Circuit has noted, "[f]requently, attorneys and courts confuse the concepts of standing with that of capacity to sue and with the real party in interest principle." *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992). "The determination of whether a plaintiff has standing requires a court to evaluate whether and to what degree the party has personally suffered harm or threatened harm, whether that harm or threatened harm can be fairly traced to the defendant's alleged illegal conduct, and whether the plaintiff's alleged harm is likely to be redressed by the relief he requests." *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1086 (6th Cir. 1989). Though not susceptible of precise definition, the Supreme Court has stated that this harm or "injury in fact" must be "concrete and particularized" and "'actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

3

The real party in interest principle is related to, but different than the concept of standing. *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 532 (6th Cir. 2002); *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1147 (6th Cir. 1975). As stated in Federal Rule of Civil Procedure 17(a), "[a]n action must be prosecuted in the name of the real party in interest." "[T]he real party in interest is the person who is entitled to enforce the right asserted under the governing substantive law." *Certain Interested Underwriters v. Layne*, 26 F.3d 39, 42-43 (6th Cir. 1994). "The real party in interest analysis turns upon whether the substantive law creating the right being sued upon affords the party bringing the suit a substantive right to relief." *Id.* at 43.

The importance of the distinction between standing and real party in interest is their respective remedies. If a party does not have standing it must be dismissed from the action. On the other hand, "[t]he Court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Generally, "'[a] Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants.'" *Zurich*, 297 F.3d at 534 (Gilman, J., concurring) (quoting *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997)).

Here, JSC appears to have standing. JSC claims that Farris has taken business from it and requests an injunction and damages. JSC has alleged actual harm traceable to Farris's conduct which would likely be redressed by the relief it seeks. The potential problem, as referenced by Farris in a footnote to his reply brief, is that JSC was not a party to the Agreement between MidWest and Farris, nor was it a third party beneficiary to that contract. *See Presnell*

4

*Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 579 (Ky. 2004). Therefore, JSC can only enforce the Agreement against Farris if the rights under the Agreement were assigned to JSC. *See Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 928 (6th Cir. 2000) (holding noncompetition clauses assignable under Kentucky law).

**B.      JSC Was Not Assigned Rights Under The Agreement.**

JSC contends that MidWest assigned all of its assets and contracts to JSC in the APA, including Farris's Agreement. In particular, Section 1.1 of the APA provides that at the closing, MidWest "shall grant, sell, convey, assign and deliver . . . all right title and interest . . . to the following real and personal property (hereinafter referred to as 'Assets')" to JSC:

> (a)      All assets used by [MidWest] to operate [MidWest's] business, including but not limited to the furniture, fixtures and equipment, card lock monitoring system, Veeter-Root system, storage tanks, pumps and accessories described on Schedule 1.1(a) attached hereto. . . .

> (i)      All other assets, whether tangible or intangible, which are required and necessary to operate the business, including but not limited to registration, licenses and permits, and all contracts and personal property leases (to extent such contracts are assignable and to the extent [JSC] agrees to assume such contract and any related liability), and any other information utilized in the operation of the business . . . .

JSC states that subsection (a) assigned the Agreement, because a contract is an asset. Subsection (i) then superfluously assigned all other assets necessary to operate the business, including all contracts. Farris argues that subsection (a) refers only to physical and/or tangible assets, and that subsection (i) refers to contracts such as the Agreement. He further argues that subsection (i) only applies to assets "which are required and necessary to operate the business" and because non-compete agreements are not required and necessary, this paragraph does not assign the

Agreement to JSC.

An interpretation of a contract that gives meaning to all of its provisions is favored over an interpretation that renders part of it superfluous. *See City of Louisa v. Newland*, 705 S.W.2d 916, 918 (Ky. 1986) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible."); *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608, 616 (2005) ("[A]n interpretation of a contract giving meaning to all of its provisions is favored over one leaving 'a portion of the contract useless, inexplicable, void, or superfluous.'"). If Section 1.1(a) of the APA assigned all contracts to JSC, then part of subsection (i) would be superfluous. The better interpretation is that subsection (a) refers to physical assets such as furniture, fixtures and equipment and subsection (i) refers to contracts. Subsection (i), however, is limited: it only applies to assets which are required and necessary to operate the business. Subsection (i) is also limited to contracts to the extent that such contracts are assignable and to the extent JSC agreed to assume such contract and any related liability. Thus, to bring its claim JSC must show that the Agreement is required and necessary to operate its business, that the Agreement is assignable, and that JSC agreed to assume the Agreement and any related liability.

JSC has not presented any evidence that the Agreement is required and necessary to operate its business. JSC states that "Kentucky courts have . . . acknowledged that noncompetition clauses play a critical role in business and are favored as long as they are reasonable in geographic scope and duration." *Managed Health Care Assocs.*, 209 F.3d at 928 (citing Kentucky state cases). The question here, however, is not whether noncompetition clauses generally are favored, the question is whether the Agreement is required and necessary to

operate JSC's business. Farris does not dispute that noncompetition agreements are valuable to businesses and that they may be assigned.

JSC argues that this logic conflicts with paragraph 13 of the Agreement, which provides:

> This Agreement shall be binding upon me, my personal representatives and successors, and shall inure to the benefit of the Company and successors and assigns as long as these successors and assigns are siblings of the current owners of MidWest Terminal, Inc.

JSC states that this paragraph specifically envisions an assignment. Although this is true, the paragraph limits the assignment to siblings of the then owners MidWest. There is no evidence that JSC is related to MidWest. Therefore it appears that even if JSC could show that the Agreement was required and necessary, the assignment may have been prohibited by the Agreement itself. Regardless, paragraph 13 does not support the assignment of the Agreement to JSC.

Moreover, there is not evidence that JSC agreed to assume the Agreement and any related liability. Farris goes one step further and argues that JSC expressly renounced acquisition the Agreement in the APA. Paragraph 2.11 of the APA, titled "Seller's Employees," provides as follows:

> As of the closing date, [MidWest] will terminate all of its employees. [MidWest] has or will pay all wages, bonuses, vacation pay, sick pay and other compensation to all employees of [MidWest] for all periods through the date of Closing. *There are no verbal or written agreements with employees regarding compensation or other aspects of employment that will bind [JSC] after Closing.* [MidWest] has or will pay all withholding, payroll and other similar taxes relating to his employees for all periods through the date of Closing. [JSC] does not assume and has no liability for any amounts payable to [MidWest's] employees.

(emphasis added). As JSC correctly notes, this paragraph does not relieves employees of their obligations, it only releases JSC of any obligations to MidWest's employees. Similarly,

paragraph 1.6(c)(iii) only absolves JSC from assuming liability under a benefit arrangement. However, these paragraphs do indicate that JSC intended to start with a clean slate with regards to MidWest's employees.

Because JSC has not shown that the Agreement is required and necessary to operate its business or that it agreed to assume the Agreement and any related liability, the Court finds that the APA did not assign the Agreement to JSC. The Court also notes that paragraph 9 of the Agreement does not apply to the present facts, contrary to what JSC argues. Paragraph 9 provides as follows:

> This Agreement shall remain in full force and effect if I leave the Company for any reason and thereafter I am rehired by the Company. Under such circumstances, it is unnecessary for the Company to have me execute a new Agreement.

Even if Farris's termination could be construed as "leav[ing] the Company," he was not "rehired by the Company." The "Company," as defined by the Agreement, is MidWest and its subsidiaries or affiliates. JSC is not a subsidiary or affiliate of MidWest. Farris was not "rehired," he was just hired.

### C. MW Terminal May Move To Join This Action.

JSC argues that if the Court determines there was no assignment the Court should enter an order directing MW Terminal, Inc. f/k/a MidWest Terminal, Inc. ("MW Terminal") to be substituted as the plaintiff. Farris responds that it would be futile to allow MW Terminal to join this action because it does not have standing. Farris states that MW Terminal cannot show that it has suffered harm since it is not functioning as a business selling fuel and oil.

While Farris's argument may ultimately have merit, Rule 17(a)(3) directs that the Court "may not dismiss an action for failure to prosecute in the name of the real party in interest until,

after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." The Court will therefore allow MW Terminal thirty days from the date of this order to file a motion to join this action as the real party in interest. The Court will not address whether MW Terminal has standing, or whether the Agreement's non-compete clause was triggered when Farris was terminated by MidWest, until such a motion is ripe. If MW Terminal does not move to be joined, then Farris may offer a proposed order of dismissal to the Court.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (DN 23) is GRANTED IN PART AND DENIED IN PART. JSC is dismissed as plaintiff. MW Terminal, Inc. f/k/a MidWest Terminal, Inc. has thirty days from the date of this order to move to join this action as plaintiff.